**RECEIVED**

MAR 2 0 2020

**BY MAIL**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
_____DIVISION

*Bethany Druce*

Plaintiff(s),

v.

*Kraft Heinz Company*

Defendant(s).  (Enter above the full name(s)
of all defendants in this lawsuit. Please
attach additional sheets if necessary.)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____
(to be assigned by Clerk of District Court)

JURY TRIAL DEMANDED

YES ☒    NO ☐

## EMPLOYMENT DISCRIMINATION COMPLAINT

1.      This employment discrimination lawsuit is based on (check only those that apply):

☒      Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, for
employment discrimination on the basis of race, color, religion, gender, or national origin.
**NOTE:** *In order to bring suit in federal district court under Title VII, you must first obtain
a right-to-sue letter from the Equal Employment Opportunity Commission.*

____      Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et seq.*, for
employment discrimination on the basis of age (age 40 or older).
**NOTE:** *In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file charges with the Equal Employment Opportunity
Commission.*

____      Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*,
for employment discrimination on the basis of disability.
**NOTE:** *In order to bring suit in federal district court under the Americans with
Disabilities Act, you must first obtain a right-to-sue letter from the Equal Employment
Opportunity Commission.*

____ Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et seq.*, for employment discrimination on the basis of a disability by an employer which constitutes a program or activity receiving federal financial assistance.

**NOTE:** *In order to bring suit in federal district court under the Rehabilitation Act of 1973, you must first file charges with the appropriate Equal Employment Office representative or agency.*

____ Other (Describe)

## PARTIES

2.   Plaintiff's name: *Bethany Druce*

Plaintiff's address: *709 North John Street*
Street address or P.O. Box

*Kirksville, Mo 63501   Adair County*
City/ County/ State/Zip Code

*(660) 734-5028*
Area code and telephone number

3.   Defendant's name: *Kraft Heinz Company*

Defendant's address: *200 East Randolph Street # 7600*
Street address or P.O. Box

*(Corporate Headquarters   Chicago, Illinois 60601   Cook County*
City/County/State/ Zip Code

*address listed)   (800) 543-5335*
Area code and telephone number

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES, ADDRESSES AND TELEPHONE NUMBERS ON A SEPARATE SHEET OF PAPER.**

2

4.  If you are claiming that the discriminatory conduct occurred at a different location, please provide the following information:

*— NA —*

| | | | |
|---|---|---|---|
| (Street Address) | (City/County) | (State) | (Zip Code) |

5.  When did the discrimination occur?  Please give the date or time period:

*First incident was on June 19, 2019. The second Incident was on July 4, 2019.*

## ADMINISTRATIVE PROCEDURES

6.  Did you file a charge of discrimination against the defendant(s) with the Missouri Commission on Human Rights?

☐ Yes   Date filed: _____

☒ No

7.  Did you file a charge of discrimination against the defendant(s) with the Equal Employment Opportunity Commission or other federal agency?

☒ Yes   Date filed: *October 31, 2019*

☐ No

8.  Have you received a Notice of Right-to-Sue Letter?

☒ Yes                    ☐ No

If yes, please attach a copy of the letter to this complaint.

9.  If you are claiming age discrimination, check one of the following:

_____60 days or more have passed since I filed my charge of age discrimination with the Equal Employment Opportunity Commission.

_____fewer than 60 days have passed since I filed my charge of age discrimination with the Equal Employment Opportunity Commission.

## NATURE OF THE CASE

10.    The conduct complained of in this lawsuit involves (check only those that apply):

\_\_\_\_ failure to hire me

\_X\_ termination of my employment

\_\_\_\_ failure to promote me

\_\_\_\_ failure to accommodate my disability

\_\_\_\_ terms and conditions of my employment differ from those of similar employees

\_X\_ retaliation

\_X\_ harassment

\_\_\_\_ other conduct (specify):

Did you complain about this same conduct in your charge of discrimination?

    [X] Yes            [ ] No

11.     I believe that I was discriminated against because of my (check all that apply):

_X_   race

____   religion

____   national origin

____   color

____   gender

____   disability

____   age (birth year is:    _____ )

____   other:


Did you state the same reason(s) in your charge of discrimination?

    ☒ Yes                 ☐ No

12.     State here, as briefly and clearly as possible, the essential facts of your claim. Describe specifically the conduct that you believe is discriminatory and describe how each defendant is involved in the conduct. Take time to organize your statement; you may use numbered paragraphs if you find it helpful.  It is not necessary to make legal arguments, or to cite cases or statutes.

Please see attached, typed document.

This document is titled Charge of

Discrimination Narrative.


(Continue to page 6, if additional space is needed.)

5

(Attach additional sheets as necessary).

6

13.     The acts set forth in paragraph 12 of this complaint:

⬜ are still being committed by the defendant.

⬜ are no longer being committed by the defendant.

☒ may still be being committed by the defendant.

## REQUEST FOR RELIEF

State briefly and exactly what you want the Court to do for you.  Make no legal arguments;
cite no cases or statutes.

*Please see attached, typed document.
This document is titled "What I Want
the Court to do for Me."*

14.     Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of
my knowledge, information, and belief that this complaint: (1) is not being presented for an
improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of
litigation; (2) is supported by existing law or by a nonfrivolous argument for extending,
modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if
specifically so identified, will likely have evidentiary support after a reasonable opportunity for
further investigation or discovery; and (4) the complaint otherwise complies with the requirements
of Rule

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this *13* day of *March*, 20 *20*.

Signature of Plaintiff *Bethany A. Druce*

8

Bethany Druce - Charge of Discrimination Narrative
March 13, 2020

My name is Bethany Druce, and I am a twenty-seven year old female of Asian descent. It should
be noted that I can provide copies of all emails mentioned in this narrative.

I began working at the Kraft Heinz manufacturing plant in Kirksville, Missouri on June 11, 2018.
When I was hired on this date, my job title was Operations Technician. About one month later, I
interviewed for a Team Lead position. A Team Lead is a supervisory role that works directly
under the Production Supervisor; they have responsibilities over the production floor including
safety of employees, quality of the manufacturing processes, and the quantity and quality of the
overall production yield. I was promoted to Team Lead after my interview and was assigned this
position on the Raw Side of the plant from mid September 2018 through June 5, 2019.

On June 5, 2019 I was involved in a work-related argument in the main hallway with a fellow
Team Lead, John Thomas. The disciplinary action taken against me was a temporary suspension
and then a demotion back to an Operations Technician as well as a transfer to the Ready to Eat
(RTE) side of the plant. I accept full responsibility for the argument and discipline as a result.
My allegations concerning this Charge of Discrimination do not concern this particular
disciplinary action, for I am accountable for my mistake. However, it should be noted that
neither myself nor John Thomas signed any paperwork concerning this action. I believe this to
be a violation of Kraft Heinz's company policy, as an employee must be formally counseled and
sign an official write-up acknowledging the discipline before any action can be taken against
them. No one from the Human Resources Department met with me to discuss my discipline. I
simply received a phone call from Meghan Maxwell in the HR Department informing me of my
new job assignment. It should be noted at this time that in Kraft Heinz's formal Position
Statement to the EEOC, Kraft claimed that Kristen Thomure (a senior member of Kraft
Kirksville's HR Department) met with both myself and John Thomas to discuss our discipline.
This is false. No one met with either one of us. When I left the company, I requested my entire
HR file. Kraft sent over a partial including only onboarding documents from when I was hired
as well as any write-ups I had on file. There was no write-up concerning my demotion. I knew I
had never signed anything, so I was not surprised. I do not know why Kraft provided false
information to the EEOC claiming I was counseled about my discipline, for I was not.

It should be noted at this time that John Thomas and I were involved in a personal relationship at
this time. Furthermore, John's previous girlfriend Debra Brantner worked in the Ready to Eat
Department as a Team Lead. Ms. Brantner did come over to the Raw Department once while I
was a team lead and acted inappropriate toward me. She came into the Cookhouse, an area over
which I was responsible, and was digging on me in front of my operators. I did report this to her

1

supervisor, Jarrod Blessing and asked him to kindly keep her away from this area if at all possible, for I did not appreciate the acts of teasing and unprofessional behavior she exhibited toward me. I informed him I did not want to write a formal statement to HR, for I was hoping he could take care of the matter. However, this incident did reach the offices of HR, for Kristen Thomure (head of HR at the time) was aware of it. After experiencing this, when Meaghan Maxwell called to inform me of my new job assignment in the RTE Department, I requested to be placed as far away from Ms. Brantner as possible. She arranged a call between myself and Michael Sieve (the RTE Production Manager at the time). Michael and I spoke, and he informed he would place me on the opposite day shift as Ms. Brantner. Ms. Brantner worked A Team, 3 am to 3 pm. I was assigned to C Team, 3 am to 3 pm. He informed the only possible overlap would be in the event of either of us working overtime; he went on to say that he'd ensure I was not placed on her line in this case.

On June 19, 2019 I reported for my first day of work as an Operations Technician on the RTE side of the plant. Ms. Brantner was working overtime that day. At the beginning of my shift, she approached me in the locker room where I was changing into my uniform. She stood at the end of my locker row and said, "Now that you've been demoted, you should just go back to your own country." Ms. Brantner then laughed and immediately walked out of the locker room after making this statement. There were no witnesses to this incident, for the locker room and adjoining bathrooms were empty at this time. I did not report this to anyone, for I was already nervous beginning my new job assignment and I was running behind getting to my morning shift meeting.

Later that same day, I walked into the Team Lead Huddle Room to get fog wipes for my safety glasses, for Line 5 to which I was assigned was in Sanitation that day and I needed to keep my glasses clear of fog while cleaning. Ms. Brantner was in the room alone sitting in front of a computer. As I walked in she said, "Just so you know, you're on my side now. If I want you gone, you will be. And don't bother reporting this to anyone. If you do, I'll just deny it." I said nothing in response and left the room as quick as I could after retrieving my fog wipes. There were no witnesses to this incident. As a result of these two comments from Ms. Brantner on only my first day of work on the RTE side, on my second break I emailed Kristen Thomure in the HR Department and requested a meeting. She wrote back the next day when she was available. I responded with an email on June 24th, 2019 stating I was miserable on the RTE side and that I was having issues. I also asked about other job possibilities within the plant and asked for clarification regarding what kind of discipline I'd received following my demotion, for no one had met with me to discuss. Mrs. Thomure responded later that day asking what kind of issues I was experiencing. I did not respond to this last email. I was hoping Ms. Brantner would leave me alone moving forward, and I feared that if I reported a major issue like this after working in

2

the department for a short time, the company would terminate me. I also felt my credibility was low after being demoted, so I decided not to speak up at this time.

On July 4, 2019, I was struggling while working on Line 2 in the pack room. I was left alone while my counterpart was on break, and I was not fully trained yet. Ms. Brantner was working overtime on this day and found me in the locker room alone as I was going to my second break. She stood at the end of my locker row again and stated, "I saw you were struggling there on Line 2. I thought Asians were supposed to be smart." Ms. Brantner proceeded to laugh and smile and then walked out of the locker room. I immediately searched the locker room and adjoining bathrooms hoping someone had overheard what she'd said, but unfortunately they were empty. Therefore, there were no witnesses to this incident.

Immediately after this statement, I spoke to a coworker Deann Billington and expressed my concerns. I mentioned the comments Ms. Brantner had made to me up to this point, and Deann did not seem surprised. Deann informed Ms. Brantner has had "serious issues" with employees in the past and encouraged me to report these comments to a supervisor. Directly after this conversation, I spoke to Shane Western who was a RTE Supervisor. I told Mr. Western about the three comments Ms. Brantner had made to me up until that point. Mr. Western did not appear surprised to hear what I was telling him. I informed him no one was around when Ms. Brantner approached me, but I recall specifically asking if there were cameras in the Huddle Room. Unfortunately, he told me there were no cameras in the department except for the break room. He informed me he'd speak with Ms. Brantner about my concerns and her statements. I told Mr. Western I did not want to involve Human Resources at this point, and he asked me to write an informal statement. I completed this informal statement on a blank sheet of computer paper and turned it into John Beeler, who was a direct supervisor over Ms. Brantner in the RTE Department. I told Mr. Beeler I was told to hand my informal statement to Mr. Western, but he was out of the office at the time and was going to be gone a couple days. Mr. Beeler accepted my statement and told me he'd try to keep a close eye on things.

On July 23, 2019, while I was walking to my break, Ms. Brantner stepped out of the Team Lead Office to the hallway where I was walking. She called me a "stupid bitch" as I walked by her. There was no one else in the office or the hallway where we were walking, so no one overheard this comment. On this same day after my shift ended, I called the Human Resources Manager, Kristen Thomure, and asked to meet with her as soon as possible. I recall sounding extremely upset on the phone. Mrs. Thomure agreed to meet with me the next day.

On July 24, 2019, on my scheduled day off, I had a meeting with Mrs. Thomure. I explained the incidents for Ms. Brantner and stated that I should have reported these comments sooner. I decided to officially file a formal complaint. While meeting with her, I became emotional and

3

apologized for crying but that this was all extremely embarrassing and difficult to deal with. I told her Ms. Brantner was creating a hostile work environment for me, for I was reluctant to even take a break for fear of her coming into the locker room and finding me alone again. I also asked Mrs. Thomure if there were cameras in the RTE Department, and she said there were none to hear knowledge. I went on to explain that I deserved to be demoted and apologized for my actions, but that I did not deserve to be harassed or on the receiving end of racially motivated comments. Mrs. Thomure agreed and said she'd meet with Ms. Brantner and have a discussion with her. Further, she stated she would have all the RTE supervisors on "heightened awareness" meaning they would be on alert and watching for any future interactions between myself and Ms. Brantner. I made it clear that I had made every effort to avoid Ms. Brantner. I informed her of the call with Michael Sieve to be placed on the opposite shift, and at times I would walk the long way around the department if I saw Ms. Brantner in the distance. I did all I could to avoid her, but I told Mrs. Thomure that Ms. Brantner was bringing the comments to me. Mrs. Thomure handed me a complaint form to fill out and instructed me to get this turned in as soon as possible. At the end of our meeting, she said that someone from the HR Department would follow up with me soon.

On July 26, 2019 I handed my formal complaint in an envelope to Kristin Nelson (maiden name Tallman) and asked her to deliver it to Mrs. Thomure in the HR Department. I asked Mrs. Nelson to deliver it, for she had a daily morning meeting on the other side of the plant and was headed to the front offices. Also, I felt I could not afford time off the line to deliver myself and the HR Department is on the other side of the plant. I confirmed with Mrs. Thomure via email that she did receive my complaint, that Mrs. Nelson had placed it in her mailbox.

By August 19, 2019, I had not heard anything from HR or any of my supervisors related to this matter. As a result, I emailed Meaghan Maxwell in HR to follow up. We set up a meeting.

On August 21, 2019, I met with Meaghan Maxwell and Megan Gregory in the HR Department. Ms. Maxwell stated there was nothing that could be done without a witness to these incidents. Ms. Maxwell suggested I take a buddy with me to break; however, in the area I was working this was not realistic for there were only two of us in the pack room and we both couldn't be gone at the same time. I was shocked by their seemingly nonchalant attitude about my complaint; simply put they did not seem to care. They made me feel like a bother. I recall Ms. Maxwell blatantly stating that my allegations were just hearsay. I became very discouraged at this point but remained respectful and thanked both ladies for their time.

On August 27, 2019, my Team Lead Eric Kelsall pulled me off the production line and asked me to follow him. This resulted in a meeting with Eric, Production Supervisor Kristin Nelson, and Meaghan Maxwell. They suggested I move to a different shift to have less overlap with Ms.

4

Brantner. At the time, I was working 3 am to 3 pm, and the move would require me to work 5 am to 5 pm. They informed me this would be my new shift permanently and that Line 6 would be my new home line to which I'd report everyday. They also stated this would hopefully prevent future interactions with Ms. Brantner, as this shift would have different break times. I asked for a few days to decide, as a shift change would affect my personal life. The second half of the meeting involved Meaghan Maxwell forbidding me to discuss any of my issues with Ms. Brantner on the production floor. I had gone to a few people for help and advice on how to handle the situation, but I asked these individuals to not say anything. When Ms. Maxwell instructed me to "keep my allegations to myself", I felt even more isolated. I felt alone and that no one was going to help me at any point in time. I agreed and stated I meant no harm, but they did not seem willing to hear anything I had to say. Following this meeting, I emailed my Production Supervisor Kristin Nelson and requested to meet with her. She responded that she'd try to pull me into the Supervisor's Office at the end of shift that day. However, she was unable to meet with me until two days later.

On August 28, 2019, I was headed to my first break while the RTE Team Leads and Supervisors were having their morning meeting. They were all standing on the other side of the double doors that separated the Supervisor's Office and the "Blue Hallway" as it is called. Ms. Brantner appeared to be released from the meeting early. She passed me in the hall as I was turning the corner to the break room and muttered "stupid bitch" to me as I passed. When she said it, she turned her head so it appeared to anyone watching that she was facing the wall as she passed. However, she still made this inappropriate comment to me. There was no one in the nearby Huddle Room or anyone close enough to hear in the break room. Unfortunately there were no witnesses to this event.

On August 29, 2019 I met with Kristin Nelson to follow up after the meeting two days earlier. I was very upset and told her that I was uncomfortable with how said meeting went. I expressed that I felt further alienated, and Mrs. Nelson responded by saying she did not intend that. I went on to try to make her understand that I did not have the intention of causing any trouble for her or making her job more difficult. She agreed that I was, as my issues with Ms. Brantner affected her staffing decisions. I went on to say this is all embarrassing and I've asked for help from several members of leadership, including the head of Human Resources Kristen Thomure. I went on to say that the comments had not stopped and informed her of the "stupid bitch" comment from the day before. Mrs. Nelson just shook her head and said with no witnesses nothing could be done. She went on to say that if anything happened in the future I should write it down on notebook paper. I found this extremely discouraging, for I felt no one cared or believed me when I reported the harassment and racial comments. At the end of the meeting, I informed Mrs. Nelson that I was willing to move to the new shift in an effort to avoid seeing Ms. Brantner and potentially putting an end to the inappropriate comments. I did not want to move,

for I liked my current shift. However, I was desperate to end the harassment and was willing to make any effort to make that happen. It is worth noting that most of the Team Leads and Supervisors in the RTE Department are very close. Therefore, I seriously questioned everyone's objectivity in handling this matter. I also considered being asked to move shifts a form of punishment.

On September 7, 2019, Ms. Brantner was working overtime and was assigned to Line 6. I was told the day before about this and that I would have to move to a different line since we could not work together. I considered this a form of retaliation, as I was removed from my new home line because of Ms. Brantner. The whole point of my agreeing to move shifts was to avoid Ms. Brantner; however, the supervisor still assigned her to my home line and instructed me to move. Ultimately, I ended up working on Line 5 that day. Toward the end of the shift, Line 5 had a product changeover. I walked to the labels cabinet for supplies, and Ms. Brantner walked behind me and muttered, "just go die" loud enough for me to hear. There were forklift drivers nearby who saw her walk behind me, but they were not close enough to hear what she'd said. I felt defeated and did not report this comment. Per Ms. Nelson's direction, I wrote this on paper. I felt this comment was beyond verbal harassment or bullying. This comment was a demonstration of pure hate.

On September 12, 2019 I was pulled off of Line 6 by Mrs. Nelson for a meeting with the Production Manager Adam (last name unknown). Adam stated I was being suspended pending an investigation for collusion. No further details concerning this investigation were provided. Mrs. Nelson followed me to the locker room while I cleaned out my locker and walked me to the front gate.

On September 23, 2019 Megan Gregory from the HR Department called me and informed the investigation was concluded and I was being terminated. On the call, I requested my employee personnel file be returned to me. She declined to provide it and the call ended. I was not provided any type of termination paperwork or other documentation regarding my separation from Kraft Heinz. I even sent a Service Letter to the plant requesting to know the reason for my termination. Kraft responded by citing a handbook violation, no additional details were given. It wasn't until I received the Position Statement that Kraft submitted to the EEOC investigator that I was informed of the reason for my termination.

On September 1st, I had an extreme lapse in judgement and messaged Grover Dow, Jr. on Facebook, asking for his help to get Ms. Brantner fired. I take full responsibility for this action and acknowledge that it was wrong. Kraft claims that Grover handed over these messages, and they considered it a justifiable reason to terminate me. However, I am hesitant to believe that Kraft saw these messages for if they did they would have seen Grover respond that he would

6

help me with my situation. It should also be noted that the next time seeing Grover at the plant, I pulled him aside and made it clear that I had no intention of following through and sincerely apologized for even asking in the first place. I informed Grover I was desperate for help, but that I had no intention of getting anyone fired. I remember him saying he understood and that it wouldn't be mentioned again. We remained friends even after I was suspended, as he reached out to me on Facebook Messenger asking if I was doing okay.

This was simply a thought, no attempt was made. I am left to wonder why Kraft considered this a reason to terminate only me when Grover also agreed to help me. If Kraft had truly read these messages, they would have seen that and Grover should have been terminated as well for committing the same act of "collusion." I consider this a form of retaliation, for the moment I made a formal complaint against a long-term employee I placed a target on my back.

Additionally, in their Position Statement, Kraft stated that Kevin Craig informed members of HR that I offered to pay him money to get Ms. Brantner fired. This is false, as I never requested anything from him regarding Ms. Brantner. I am accountable for messaging Grover, but I will not admit to something I didn't do. Kevin had asked me out twice, and I rejected his advances. He would always find excuses to come talk to me when I was working on the same line as him. This can be confirmed by Jerry Fry, who is the Team Lead for Line 5 on A Team. Jerry informed me Kevin was trouble and liked to stir the pot. Kevin was even accused of making racial comments to a fellow coworker on Line 5, Lina Bobby. I tried to stay away from Kevin and speak to him as little as possible. It should be noted that Kevin Craig and Grover were very close. Grover even told me that Kevin would talk about me to him in a sexual nature, which made Grover very uncomfortable. I believe Kevin falsified a statement to HR as a form of retaliation for rejecting his advances. And to cause trouble. To reiterate, I never asked anything of Kevin Craig. I made a point to avoid him, as it was clear he was trouble. I am left to wonder why Kraft accepted Kevin's statement without any witnesses or evidence and used it against me while I was told nothing could be done about my complaint about Ms. Brantner because I had no witnesses.

I would like Kraft to justify why only I was terminated and Grover was allowed to keep his job. This is a double standard. I firmly believe Kraft used this as a reason to get rid of me, for the moment I reported serious harassment against Ms. Brantner I was considered a liability.

Throughout my time in the RTE Department, I had several people approach me with comments about Ms. Brantner. Unfortunately, rumors began to spread after I reported the harassment so people were aware of the issues I was facing. It seemed common knowledge that Ms. Brantner is known for mistreating employees and acting unprofessional at times. The following is a list of comments made about Ms. Brantner:

7

Jana Stroud - Jana works in the safety department as head trainer. She warned me before going over to the RTE Department to do my best to avoid Ms. Brantner as she could be "extremely vindictive and is known to be a bully." Jana informed me that she once worked for Ms. Brantner on the production floor and had to leave early one day which upset Ms. Brantner. The next day, Jana came into work and discovered that someone had cut her work boots. To this day, Jana suspects Ms. Brantner and only Ms. Brantner of doing this.

Michelle Blake - Michelle works in the RTE Department and has a desk that sits in the Team Lead office. I believe she knows Ms. Brantner a little outside of work and from working with her at Kraft. I approached Michelle privately in desperation after being called a "stupid bitch" and asked her for advice on how to make the harassment end. As someone who knew Ms. Brantner better than I did, I was hoping Michelle could help. When I told Michelle about the "stupid bitch" comment, her first words were, "I can see her saying that. She can be extremely petty."

Amy Miller-Barto - Amy is the USDA inspector assigned to the Kraft Kirksville plant. Her job requires her to be on the production floor auditing the process and ensuring quality standards are met. Amy informed me that she's had people tell her that if Ms. Brantner does not like someone, she will place said person in a "crappy job" to make their day miserable in hopes that they'll quit.

Jerry Fry - Jerry is the Team Lead over Line 5 on A Team. I recall one day informing Jerry that I wanted to skip my break for I was afraid of running into Ms. Brantner. He could tell I was visibly upset. I went on to say that she created a hostile work environment and anytime I am walking alone and see a door open or hear someone walking behind me I become stressed and very uncomfortable. Jerry insisted I go to break and blatantly told me that "If Ms. Brantner does not like someone, it makes for a long day. She has a history of not treating young, attractive women well. She has her favorites, and if you're not one of them she will let you know."

Alan Steele - Alan is a D Team Production Supervisor on the RTE side and has worked with Ms. Brantner for years. While I have never spoken to him personally, a mutual friend informed me that Alan has witnessed Ms. Brantner mistreat people throughout the years and get away with it. This mutual friend informed me that Alan could provide a great deal of input on Ms. Brantner's treatment of her employees.

Deann Billington - Deann used to work at Kraft as an Operations Technician in the RTE Department. She was once close friends with Ms. Brantner, but when she moved to the RTE side, she requested to never be placed on her line. Deann informed me Ms. Brantner has had

8

"serious issues" with employees in the past. She recalls employees approaching her at times for advice on how to work with Ms. Brantner and complaining about how she was treating them. These employees knew Deann used to be close friends with Ms. Brantner, so they hoped she could help.

Deann mentioned Ms. Brantner severely mistreating an employee named Marla who works in Room 1. She also recalled an incident where a young girl was severely coughing on the line and asked Ms. Brantner to leave the floor so she could get a drink. The girl told Deann that Ms. Brantner told her no. Deann had met Ms. Brantner for lunch outside of work one day; Deann recalls Ms. Brantner admitting to not letting this young girl leave the line and stating, "I have no sympathy for people who smoke." This employee ended up leaving the company.

Most disturbing is Deann informing me that Ms. Brantner reached out to her on Facebook after I was terminated asking if I was employed at Western's Smokehouse at the time. I was not employed here at the time, but I am currently. Also, Deann told me she once received a call from Ms. Brantner who teased Deann about having a new "buddy" (referring to me). Ms. Brantner informed Deann she has friends at Western's who watch me and tell her who I talk to. These friends are Karen March and Russell Gene Goodhart. Deann said Karen saw us working on the same line at Western's one day and told Ms. Brantner about it. This makes me extremely uncomfortable. I constantly fear Ms. Brantner will try to sabotage my new job.

It should be noted that Ms. Brantner's son, Andrew, works in the same area as John Thomas on the same shift. One day, Andrew got into trouble. Ms. Brantner attempted to reach out to Kevin Burgess (Andrew's Team Lead) by sending him a Facebook friend request. When Kevin did not accept, Ms. Brantner called her former supervisor, Jarrod Blessing who now works in the Raw Department. She complained to Jarrod that John was "messing with her kid" and tried to get John into trouble. While this incident does not involve me, it is worth mentioning for it shows Ms. Brantner once targeted John as well.

While I do not like to speculate, I firmly believe Ms. Brantner's inappropriate behavior toward me is a result of the fact that I am involved with John Thomas, her former boyfriend. Both John Thomas and I have Ms. Brantner blocked on social media, making an effort to avoid contact. John has her cell phone number blocked as well. It should also be noted that Ms. Brantner and John had a cruise planned in December 2018, but John opted not to go for he was currently in a relationship with me. Ms. Brantner had been messaging John on Facebook requesting that he still go. This is when John blocked her.

While the Kraft Kirksville plant has its bright spots, the way their leadership is allowed to run out of control and treat their people is certainly not one of them. Additionally, this same

9

leadership has been known to disregard employee safety and violate quality standards. The following provide examples:

1. In late 2018, Plant Manager Stephen Davis held a plant manager meeting at which team leads and operations technicians were present. Stephen yelled at his entire workforce , cursed at them with extremely volatile language, and even threatened to shut down the plant because he was not satisfied with the plant's production numbers and overall results. This was extremely unprofessional and his language combined with his loud, threatening tone was incredibly inappropriate (especially for someone in his position). Kraft Corporate received several calls about this incident, and a member of HR, Kristen Thomure, sat in on the next plant manager meeting. Looking back at this, I find this behavior of Stephen's even more disappointing, for I feel it sets a horrible example for members of his leadership on the production floor, such as Ms. Brantner.

2. I recall as a Team Lead I once had an issue with an employee in my Grind Room, Randy D. Sager who was observed by a USDA inspector taking a quality shortcut. I was walking into the Grind Room when I met Kush Mahajan (Raw Production Manager at the time) who cursed at me and told me to speak to the employee. He spoke to me in a furious tone and walked away. I entered the Grind Room and spoke to Randy. Randy claimed Kush had cursed at him, called him an idiot, and stormed off. I recall Randy writing this in his statement to HR, as I had to read it and turn it in.

3. My Team Lead on Line 5 on C Team was Eric Kelsall. At first, Eric and I got along well, but after working with him more and more this began to fade. I have a very "by the book" mentality, and he did not. I began to express concerns to him, and he'd dismiss me, which soon made me feel even more isolated than I already did. The following are examples of why I questioned Eric's leadership ability and wondered why he let his room run so out of control.

   - Often, packages that were either too heavy or lightweight were kicked off the line into a bin. Standard procedure states these packages must be weighed and then placed back on the line if their weight was acceptable. Eric would remove these packages from the bin and place them back onto the line without weighing them. This created a huge quality issue, as a package could be placed in a box and sent to the customer that was underweight. I recall kindly reminding him one day that "we better weigh those first", but he dismissed me.

   - Eric was very close friends with Gina Williams, who was always placed in the Back Service position in the pack room. Gina once dropped a package of Ice Breakers mints in the Slice Room, which is a major GMP (Good Manufacturing Practices) violation. Rather than hold Gina accountable or even throw the mints away, Eric simply handed them back to her. He

noticed I observed this action, and he became uncomfortable and walked away into the pack room. I also recall Eric joking with Gina one day about a Facebook post he'd seen in which Gina's nephew called her "Aunt GiGi." Trying to be funny, Eric grabbed a piece of quality paperwork Gina had filled out, crossed out her signature at the bottom of the form, and wrote Aunt GiGi instead. I considered this highly inappropriate, for production paperwork and its accuracy are critical to the manufacturing process and overall product quality.

- One day we had a delayed Sanitation turnaround time due to having to rewash parts. This was solely because one of the team members, Brian Atkinson, did not use soap and simply rinsed them with water. When quality came to inspect the Slice Room, it failed due to dirty parts. Brian admitted to not caring about what he'd done; however, Eric did not hold him accountable or appear to even care. Brian's deliberate negligence resulted in a delayed Sanitation time and therefore a loss in production. Eric simply instructed me and another team member, Robert Allison, to properly wash the parts with soap.

- The most disturbing incident I recall was when I returned from break one day and went to inspect the line in the pack room. About five minutes later, I noticed a package of bologna came down the line that had a drawing of male genitalia. It appeared someone had used a Sharpie or pen and drawn a picture of a penis and other male organs on a package. I immediately stopped the line and escalated the issue. Eric was pulled out of a meeting and he and Gary England (the Continuous Improvement Supervisor) met with the entire staff of Line 5 and threatened to write every single person up unless someone owned up to the inappropriate act. HR did an investigation, but to my knowledge no one owned up to doing this. That day, everyone working on Line 5 was held after shift to write statements. I firmly believe that if Eric had more control of his room and held his workers accountable, this would never have happened. If I had not seen this package and pulled it off the line, it would have been packaged and sent to the customer.

4. A member of the quality staff at the Kirksville plant informed me that Area Manager Rick Combs, a long-term employee at the plant, intentionally trained a new Production Supervisor to improperly perform a metal detector check in one of the stuff rooms. Per the quality standard, at the end of each batch a metal detector check must be performed, and if there are so many hits of metal then the batch reaches its burst limit and must be placed on hold. Rick Combs trained Production Supervisor Matt (last name unknown) to wipe away pieces of metal if there are too many before quality sees it, thus preventing a

11

hold so the batch could be sliced quicker. Matt was caught doing this and was either demoted or terminated. This leads one to question that if senior members of management are intentionally violating quality standards, is this approach trickling down to the operators and compromising the quality of the product and the safety of the consumer.

5.  After being assigned to Line 6 in the RTE Department, I worked back service and my new Team Lead was Robert (last name unknown). Every shift, Robert is responsible for personally observing a metal detector check and then sign the quality paperwork stating he'd watched me perform this check. I recall twice that Robert signed this form without visually verifying me completing this check. This is intentional falsification of paperwork and a blatant disregard for a quality standard. I also recall when a small screw went missing from the MultiVac machine and ended up in a package that came down the line. This package was kicked off into a bin, and I discovered the small screw upon opening the package and combing through the pieces of bologna. Quality protocol states that the screw must be placed on the Foreign Object paperwork and that a member of the Quality department must be notified. However, Robert instructed me to give him the screw and not document this incident on paperwork. It was close to the end of the shift, and he did not want to have to stay late to deal with Quality to address the issue. I did report this to Mark Morrison, a member of the Quality personnel who said he'd follow up with Robert. However, this negligent decision from a Team Lead could potentially put a consumer at risk.

6.  A young girl named Carmen worked in the RTE Department and reported back issues to Eric Kelsall, who placed her at the "rejects table" everyday she worked opening bad packages. Carmen asked to be moved, but Eric would not accommodate her request. Further, Carmen spoke with Supervisor Kristin Nelson and reported her back pain as well. Neither Kristin nor Eric followed the company's safety procedure and completed a safety incident report for Carmen's back pain. This is a blatant violation of company policy. Carmen ended up seeing a personal doctor for her back, and when the safety department found out they terminated her.

7.  I recall being a Team Lead in the Raw Department when team member Jerry Hilderman fell in System B and landed hard on his back. Management's response to this safety incident was to allow Jerry to sit in the Team Lead office with ice on his back. I specifically recall walking into the Team Lead office to check on Jerry, and he was crying and in clear, agonizing pain. I asked him if he wished to go to the hospital, and he replied that he did want to but he was told to wait in the office. After speaking with Jerry, I called the Raw Production Manager Kush Mahajan and told him about Jerry's desire to go to the hospital, and Kush said he would speak to the safety department. However, nothing was done. Jerry remained in the office for a while later and then was sent home. I believe Kraft chose not to take Jerry to the hospital, for they wanted to

avoid having an OSHA recordable incident on file. To this day, I still feel that Jerry's overall well-being was neglected

8. One day shortly after working in the pack room, I lost my footing in the palletizer portion of the Aagard machine. Shane Western, a RTE Supervisor, observed this as he was walking by. He stopped and asked if I was okay. I recall telling him I was fine and that I'd lost my balance for a moment. Per company policy, an incident report should have been filed for a "near miss." Mr. Western failed to do this, thus violating the company's safety policy.

9. Two former employees informed me they were completing Sanitation one day in the Raw Department in one of the Stuff Rooms. They stopped and noticed exposed electrical wires hanging off the equipment. They informed their Production Supervisor, Dianna Whitmore, who instructed them to keep cleaning and spraying water. Dianna told them that was the direction she was given from her management higher up. These employees were worried about getting electrocuted the entire time they were cleaning.

10. A young Congolese woman was completing Sanitation in the Raw Department when she spilled chemical on her arms. She informed her Sanitation Team Lead, Brad Kaylor, of this who did nothing but give her longer plastic sleeves to wear. I recall her approaching me at the end of her shift and showing me her arm, which had minor chemical burns. I immediately called Rich Cullum, the sanitation supervisor at the plant, and he notified Brad Kaylor. I began filling out the incident report, but both Rich and Brad completed it. They both seemed incredibly nonchalant about the young lady's complaint and chalked the matter up to a language barrier as she spoke very little English. Had this young lady been given the help she'd originally asked for hours before, her arm would not have been in that condition. Although I did leave Brad and Rich to complete the incident report, I recall feeling uncomfortable as they were downplaying the incident.

While not all of the examples listed above involve me, they are disturbing accounts that question why the management at the Kraft Kirksville plant is so out of control. Mistreating employees, disregarding employee safety, and bypassing quality standards are critical issues that need to be addressed. These issues put employees in danger and potentially the consumer who purchases the product. I also believe there is a huge lack of objectivity regarding Production Supervisors and Team Leads in the RTE Department. I quickly gathered that all of the leadership in this department were incredibly close. Kraft needs to address these issues and explain why their leadership is allowed to manage in the manner that it does. It should be noted that these examples have been brought to my attention from speaking to current and former employees in passing. I believe if a formal investigation took place, perhaps more would be revealed. I believe more employees (former or current) will come forward to report accounts of mistreatment. It should be noted at this time that a large number of Congolese workers are

13

employed at Kraft, and several speak very little or no English. I am concerned these individuals are being mistreated as well.

I firmly believe Kraft does not hold its leadership accountable for their actions; instead, they allow their employees working on the production floor to be mistreated and gravely overlooked. While I completely acknowledge that I deserved a demotion, I did not deserve to be verbally harassed and have racial comments directed toward me. I asked for help from multiple people, including members of management and Human Resources. No one seemed to care or believe me. Even after reporting to a supervisor that the harassment was still continuing, nothing was done. Kraft could not even take the time to properly demote me. Additionally, I am disturbed by the Position Statement that Kraft submitted to the EEOC. Not only did they falsify information claiming that Kristen Thomure met with me to discuss my promotion, but they also misspelled both Ms. Brantner and Kevin Craig's names. Also, Kraft claimed in their Position Statement that no video footage could substantiate my allegations; yet I was informed there were no cameras in the RTE Department to begin with. I do not appreciate Kraft framing this piece of information. This only fuels my belief that very little attention was given to this situation. I want answers as to why this company handled this situation in the manner it did. Bigger picture, light needs shed on the way members of upper management treat their people and overlook serious quality standards. There are too many shortcuts being taken to get product out the door. I fear for both the employees currently working at the facility as well as any consumer who purchases product from this plant. The leadership is clearly allowed to run out of control and unless something is done soon to change that, I fear someone, be it an employee or consumer, will get seriously hurt.

14

Bethany Druce
March 13, 2020

What I Want the Court to Do for Me

I want the Court to direct Kraft to answer the following questions:

1. Why did Kraft only terminate me for "collusion" when a fellow employee agreed to commit this same act and he was allowed to keep his job? If Kraft's statement to the EEOC was true and they did see these Facebook Messenger messages, they would have seen this other employee agree to help me and comply with the "collusion." Why was this other employee not terminated as well? I also want to know if Grover informed Human Resources of the discussion we had at the plant, where I told him I had no intention of following through and apologized for even asking.

2. Why was Kraft not transparent about their reason to terminate me? I requested this information by sending a Service Letter inquiring details of my termination, and Kraft simply cited a violation of the employee handbook. No further information was provided to me. I did not know my reason for termination until reading the Position Statement Kraft submitted to the EEOC.

3. Why did Kraft falsify information to the EEOC stating that Mrs. Thomure met with both me and John Thomas to discuss our demotions? This is a violation of company policy, as a write-up must be on file and must be signed by someone in production, a member of Human Resources, and the employee receiving the discipline. A write-up for my demotion does not exist, proving that I was not properly demoted per company policy. Who was held accountable for this?

4. Why did Kraft state in their Position Statement to the EEOC that there was no camera footage to substantiate my claims against Ms. Brantner when I was told by a Production Supervisor and Mrs. Thomure in HR that there were no cameras in the department (except the break room where none of these incidents occurred). I specifically asked Shane Western if there were cameras in the Huddle Room to capture one of her comments to me. He informed me there were no cameras in this area. Why did Kraft make this claim about lack of video footage when no cameras existed in these areas to begin with?

5. Why did Kraft accept Kevin Craig's statement and use it against me with no evidence or witnesses? Meaghan Maxwell in Human Resources clearly stated that nothing could be done without witnesses, that my allegations were just hearsay. Yet, Human Resources accepted a false statement against me without substantiation. This is a double standard.

6. Why does Kraft allow its leadership to run so out of control? Employee safety is being overlooked, quality standards are being intentionally violated by members of management, and employees are not being treated well.

7. It seemed to be common knowledge that Ms. Brantner has a history and is known for mistreating employees and acting unprofessional. Why has she been allowed to do this with no accountability? Are there other employees who could report issues about her, or that have reported issues and nothing has been done?

8. Why did the RTE Department request I change shifts and assign me to a new home line and then assign Ms. Brantner to the same line, forcing me to move?

9. Are there other employees at the Kraft Kirksville plant who have experienced the same mistreatment as I have? Or are there other examples of senior members of management deliberately breaking quality and safety standards or acting unprofessionally towards their employees?

I want answers to these questions, and I am hoping throughout the trial I will get them. I want Production Supervisors and members of Human Resources to explain why nothing was done when I reported this harassment about an employee who clearly has a history of mistreatment of staff and acting unprofessionally. When I reported that the harassment continued, why were no actions taken?

This incident has greatly affected my personal life, my reputation, and my peace of mind. My self-esteem also took a huge hit after being told to "just go die." From my first day in the RTE Department, Ms. Brantner made me feel uncomfortable, unwelcome, and created a hostile working environment for me. Every day before leaving for work, I worried if she'd be there. Due to the severe staffing issues in the RTE Department at the time, employees were advised to sign up for overtime slots so they could pick which days to work. I usually signed up for two days of overtime each time the list was posted, for I knew I'd be forced anyway if I didn't and wanted to choose my days. I dreaded every overtime shift, for I feared of running into Ms. Brantner. This made for a long, miserable 12-hour shift.

I believe Kraft needs to be held accountable for the way they allow the leadership at the Kirksville plant to operate. They need to justify why senior members of management, including the Plant Manager, are permitted to yell at employees. Big picture, I want to know what actions Kraft will take to get the Kirksville plant under control. I believe a trial will reveal even more appalling information and perhaps government agencies like OSHA need to become involved. A great deal of change is desperately needed. And sooner than later for the sake of Kraft's employees and consumers.